**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

FILED.
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2013 DEC 16 AM 8: 55

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

| | |
|---|---|
| United States of America, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| Real Property Located at 414 Water Street, | ) |
| Unit 1801, Baltimore, MD, Including | ) |
| All Structures, Appurtenances and | ) |
| Improvements thereon, and Real Property | ) |
| Located at 5075 Jericho Road, Columbia, MD, | ) |
| Including All Structures, Appurtenances and | ) |
| Improvements thereon, | ) |
| | ) |
| *Defendants In Rem.* | ) |

Civil No. ___**CCB13CV3685**

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff states:

**JURISDICTION AND VENUE**

1.     This is a civil action *in rem* for forfeiture of certain real properties located in the

District of Maryland, Northern Division.

2.     The United States District Court for the District of Maryland has subject matter

jurisdiction under 28 U.S.C. §§ 1345 and 1355(a), and 21 U.S.C. § 881.

3.     Venue is proper under 28 U.S.C. §§ 1355(b)(1)(B) and 1395(b).

**THE PARTIES**

4.     The plaintiff is the United States of America.

5.     The defendants are:

    a.  Real property located at 414 Water Street, Unit 1801, Baltimore, MD, including all structures, appurtenances and improvements thereon, said property being a condominium owned by Paul E. Sessomes ("Defendant Property #1"); and

    b.  Real property located at 5075 Jericho Road, Columbia, MD, including all structures, appurtenances and improvements thereon, owned by Paul E. Sessomes and Juliet M. Branker ("Defendant Property #2").

Defendant Property #1 and Defendant Property #2 are hereafter sometimes referred to collectively as the "Defendant Properties".

## FACTUAL BACKGROUND

6.     Since early 2008 and continuing through the present, the Drug Enforcement Administration New York Field Division ("DEA/NY"), the Drug Enforcement Administration Bogota Country Office ("BCO"), and other law enforcement agencies including the Criminal Investigation Division of the Internal Revenue Service ("IRS-CID"), have been targeting the heroin trafficking and related money laundering activities of JORGE HUMBERTO ESPITIA-ARCINIEGAS ("JORGE"), CARLOS ANDRES ESPITIA-GARCIA ("CARLOS"), the nephew of JORGE, both of whom reside in Colombia, and two other conspirators located inside the United States who subsequently became cooperating confidential sources, identified herein as CS-1 and CS-2 (collectively, the "Targets"). Based upon information obtained through court-authorized wiretap intercepts of JORGE conducted by the Colombian Special Investigative Unit ("SIU"), in conjunction with DEA/NY and BCO, law enforcement identified PAUL SESSOMES

("SESSOMES"), a Baltimore area resident, as another member of the organization and actively involved in its illegal activities.

7.    In February 2008, based upon information obtained in a 2007 DEA investigation in New Jersey and New York involving CS-1, the BCO and the SIU began judicially authorized wire intercepts in Colombia of a phone used by JORGE. On April 4, 2008, DEA Bogota intercepted JORGE calling a Baltimore area cellular telephone. During the call, JORGE left a voicemail stating "Good morning Paulie, it's Georgie, I have the good news very soon. I'll call you very soon." Law enforcement identified PAUL SESSOMES as the user of the Baltimore cellular telephone number.

8.    On April 28, 2008, New York City's Special Narcotics Prosecutors' Office authorized the interception of wire communications occurring to and from CS-1's cellular phone in New York. Conversations involving JORGE, CARLOS and CS-1 discussing in detail their drug money laundering activity were intercepted. These conversations included discussions of amounts of drug money being transported and laundered, and identified specific bank accounts.

9.    During the investigation, agents identified CS-2 as a Miami-based member of the organization whose job was to coordinate pickups of narcotics proceeds on behalf of JORGE. On various occasions, CS-2 was intercepted using CS-1's cellular telephone to contact SESSOMES on his cellular telephone number. Based upon these conversations, DEA/NY determined that CS-2 and CS-1 were regularly traveling to the greater Baltimore area to collect narcotics proceeds from SESSOMES.

10.    Subsequently, a number of pertinent calls were intercepted involving CS-1, CS-2, CARLOS, SESSOMES, and JORGE indicating their ongoing involvement in drug money

3

laundering. Subsequent debriefings of CS-1 and CS-2 confirmed that during these calls they were discussing with CARLOS and SESSOMES the collection of drug proceeds in the Baltimore area.

11.     On July 30, 2008, a call was intercepted by DEA/NY between CARLOS and CS-1 discussing an upcoming trip to Baltimore to collect drug proceeds from SESSOMES. During the call, CARLOS tells CS-1 that he/she will be needed to meet with SESSOMES during the coming weekend to collect drug proceeds.

12.     On August 2, 2008, a call was intercepted by DEA Bogota between SESSOMES and CARLOS, wherein CARLOS refers to CS-2 by name, and says CS-2 will be arriving "this weekend" to meet with SESSOMES and collect drug proceeds.

13.     On August 3, 2008, a series of calls were intercepted by DEA/NY and BCO. The calls confirmed that on August 3, 2008, CS-1 and CS-2 traveled from New York to Baltimore where CS-2 met with SESSOMES for the purpose of collecting narcotics proceeds. On the same date, Colombian authorities intercepted CARLOS speaking with SESSOMES confirming the amount of narcotics proceeds SESSOMES was to deliver to CS-1 and CS-2. CARLOS stated that he had spoken with JORGE, who indicated SESSOMES should deliver "300" (which was determined by agents and later confirmed by CS-1 and CS-2 to mean $300,000) to CS-1 and CS-2. A short time after this conversation, DEA/NY agents intercepted SESSOMES and CS-2 discussing the meeting location for the delivery of the $300,000. After collecting the narcotics proceeds, CS-1 and CS-2 returned to New York.

14.     Two days later, on August 5, 2008, a New York state search warrant was executed at CS-1's residence and approximately $180,000 was seized. CS-1 was arrested.

4

15.     In a post arrest statement CS-1 admitted her involvement with CARLOS, JORGE, CS-2, the person she knew from conversations with CS-2 as "La Paula," identified as SESSOMES, and others in the collection of drug proceeds and structuring the proceeds into multiple bank accounts, primarily at the direction of CARLOS.

16.     On October 02, 2008, SESSOMES was observed meeting with THOMAS COREY CROSBY ("CROSBY"), who has been the subject of multiple DEA Baltimore investigations and has an extensive criminal record involving the distribution and sale of heroin and cocaine.   Upon information and belief CROSBY used Westport Auto Inc., a used car business, to launder drug money.[1]   Subpoenaed bank records reveal that SESSOMES is the purported Vice President of Westport.

17.     During the fall of 2009, law enforcement learned that SESSOMES rented two self-storage units in the Baltimore Area.   On December 2, 2009, following a drug dog alert, search and seizure warrants were executed on the self-storage units resulting in the seizure of $535,200 in U.S. Currency, in addition to documents in the name of SESSOMES.

18.     In July 2012, law enforcement interviewed CS-2 while he was incarcerated on an immigration charge.   CS-2 stated that he met JORGE while incarcerated with JORGE's son in the early 1990s.   JORGE offered him the opportunity to make extra money by conducting cash pick-ups from SESSOMES.   CS-2 stated that during telephone conversations, JORGE confided to CS-2 that SESSOMES was his best client, which CS-2 understood to mean drug trafficking customer. CS-2 stated that JORGE told him that SESSOMES was selling "H" for the Targets,

---

[1] On January 29, 2009, $263,784 was seized from CROSBY'S residence and approximately six weeks later he was arrested for possession of 500 grams of heroin. He is currently serving a 10-year jail sentence for possession with intent to distribute heroin.

which CS-2 understood to mean heroin sent from Colombia to SESSOMES in Baltimore. JORGE stated SESSOMES was very "honest and good" because SESSOMES always maintained the money correctly and never tried to cheat the Targets. For example, JORGE told CS-2 that at one point he lost contact with SESSOMES for several months and when they reconnected SESSOMES had approximately $60,000.00 in drug proceeds waiting for JORGE.

19.     CS-2 stated from that from 2006 through August 2008, he met with SESSOMES approximately ten to twelve times for drug money pick-ups.

20.     CS-2 stated he would use a pre-paid cellular telephone with a Maryland area code to contact SESSOMES whenever he was coordinating a money pick-up. CS-2 stated he would normally pick up between $70,000 to $120,000 cash from SESSOMES at a time, and then drive the money to New York, where he would count the money, and leave it with CS-1 to deposit the cash in various bank accounts.

21.     On August 1, 2013, a federal Grand Jury sitting in the Eastern District of New York returned a sealed Indictment charging SESSOMES and three others, including JORGE and CARLOS, with conspiracy to launder monetary instruments during the period January 2006 through December 2009 in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(h), and 3551 et seq., and with laundering of monetary instruments for the events of August 3-5, 2008, as described in paragraphs 13-14 hereof, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 2, and 3551 et seq. The Grand Jury found the "specified unlawful activity" supporting the charges to be narcotics trafficking in violation of 21 U.S.C. §§ 841(a)(1), 846, 952, 959, and 963. The Indictment was unsealed on December 6, 2013.

## FINANCIAL TRANSACTIONS

22.    A review of SESSOMES' Federal Tax Returns reveals the following declared income:

| Source | 2007 | 2008 | 2009 | 2010[2] | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Gross Receipts from Westport Auto Car Sales | $65,000 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Net Profit | $41,707 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Rental Income | $0.00 | $31,800 | $31,800 | $0.00 | $0.00 | $0.00 |

23.    During the period 2007 through June 2008, twenty-three checks were drawn from Westport Auto Inc., totaling approximately $255,000, and deposited into SESSOMES' personal bank accounts. During the same period SESSOMES deposited approximately $140,000 in U.S. currency into his personal bank accounts.

24.    Tax records confirm that Westport Auto did not issue any Forms 1099 or W-2 to SESSOMES during the period 2007-2009. SESSOMES had no other known source of legitimate income during that period except for rental income of $31,800 reported in 2008 and 2009. SESSOMES has no reported income or employment since 2009.

---

[2] SESSOMES reported no income for the years 2010 to 2012.

**Defendant Property #1**

25.     On February 19, 2008, SESSOMES purchased 414 Water Street, Unit #1801, Baltimore, MD 21201.  According to the Uniform Residential Loan Application, the purchase price was $433,250 and the loan amount was $205,000.   Settlement records for the aforementioned property reveal two checks from a Chevy Chase bank account in the name of Westport Auto totaling $13,200, payable to Capitol Title.  One check was dated December 21, 2006, for $4,000, and in the memo section it lists "bills."  The second check was dated January 2, 2007, for $9,200, and in the memo section it lists "bills #1801."  Settlement records also reveal a check from Capitol Title dated December 14, 2007, payable to Bay Home Title, in the amount of $27,621.29, representing SESSOMES' earnest money deposit.  Also included were a SunTrust Bank Official Check for $111,000 dated February 19, 2008, and a Provident Bank Official Check for $112,450 dated February 19, 2008.  These two checks were presented by SESSOMES at settlement.

26.     A review of SESSOMES' SunTrust savings account reveals that on April 19, 2007, a $35,000 check from Westport Auto was deposited into his account.  On February 19, 2008, SESSOMES conducted two transactions:  SESSOMES deposited $2,000 into his savings account and then withdrew $38,000 from the same account.

27.     A review of SESSOMES' SunTrust checking account reveals that from 2007 to February 2008, SESSOMES deposited checks from Westport Auto totaling $55,000, along with $32,000 in cash.  On February 19, 2008, SESSOMES withdrew $73,000 from this account. SESSOMES then used the funds he withdrew from his savings and checking account to purchase

8

an Official Check from SunTrust in the amount of $111,000, which was presented at settlement on Defendant Property #1 on February 19, 2008.

28.     A review of SESSOMES' Provident Bank checking account reveals that from 2007 to February 20, 2008, SESSOMES deposited checks from Westport Auto totaling $63,000, along with $109,000 in U.S. currency, into his account.  On February 19, 2008, SESSOMES withdrew $75,760.96 from this account.  On the same day SESSOMES withdrew $36,689.06 from his Provident Bank savings account.  SESSOMES then used the funds he withdrew from his checking and savings accounts to purchase a Cashier's Check from Provident Bank in the amount of $112,450.02, which was presented at settlement on Defendant Property #1 February 19, 2008.

### Defendant Property #2

29.     A review of the settlement records for 414 Water Street, Unit #1801, Baltimore, Maryland, revealed that SESSOMES also owns 5075 Jericho Road, Columbia, Maryland. SESSOMES purchased this property in April 1999 for $380,000 with a loan amount of $215,000.

30.     A review of SESSOMES' mortgage loan and bank records reveals that SESSOMES' monthly mortgage payment for both properties has been and continues to be (through at least October 2012) approximately $4,000.  The mortgage payments are made from the various accounts described herein.

31.     From 2007 through October 2012, a total of 251 individual cash deposits totaling approximately $406,627 were made into various bank accounts owned by SESSOMES, to wit:

9

- In 2007, SESSOMES made 59 cash deposits totaling $118,000;

- In 2008, SESSOMES made 32 cash deposits totaling $64,500;

- In 2009, SESSOMES made 53 cash deposits totaling $97,900;

- In 2010, SESSOMES made 47 cash deposits totaling $60,545;

- In 2011, SESSOMES made 34 cash deposits totaling $39,515; and

- In 2012, SESSOMES made 26 deposits through October totaling $26,167.

32.     Plaintiff alleges these monies were used to purchase Defendant Property #1, and then to maintain and pay the mortgages for both of the Defendant Properties.

33.     Plaintiff alleges the cash deposited into SESSOMES' bank accounts were proceeds from his drug trafficking business. SESSOMES primary source of income from 2007 to at least 2009 was narcotics trafficking, as described herein. SESSOMES' federal tax returns for that period reveal that SESSOMES reported only $128,000 in income, amounts well below the amount of cash deposited into his personal bank accounts, which totaled approximately $280,000 from 2007 to 2009, nor do SESSOMES' tax returns account for the approximately $200,000 down payment on Defendant Property #1 in 2008, or the approximately $535,000 in cash which was seized from SESSOMES' storage lockers in 2009. Through at least October 2012, SESSOMES has continued to make significant cash deposits even though he has no reported income or employment since 2009.

34.     Plaintiff alleges that SESSOMES laundered his drug proceeds through both the Westport Auto business bank accounts and his personal bank accounts. SESSOMES then used the monies to purchase Defendant Property #1, and then to maintain and pay the mortgage payments on both of the Defendant Properties.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
(18 U.S.C. §§ 981(a)(1)(A) and 1956)

35.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 34 as though fully set forth herein.

36.    18 U.S.C. § 1956(a)(1)(B)(i) criminalizes knowingly engaging in or attempting to engage in financial transactions involving the proceeds of a "specified unlawful activity" knowing that the transactions are designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the SUA proceeds.   18 U.S.C. § 1956(h) criminalizes a conspiracy to violate any of the provisions of 18 U.S.C. § 1956.

37.    18 U.S.C. § 981(a)(1)(A) provides for forfeiture of  "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 . . . or any property traceable to such property."

38.    At all times pertinent to this Complaint, and for the reasons set forth above, Plaintiff alleges that the Defendant Properties constituted real property involved in or traceable to property involved in a transaction in violation of 18 U.S.C. § 1956, and are therefore subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 1956.

**SECOND CLAIM FOR RELIEF**
(18 U.S.C. §§ 981(a)(1)(C) and 1956(c)(7))

39.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 34 as though fully set forth herein.

40.    18 U.S.C. § 981(a)(1)(C) provides for forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of…any offense

constituting 'specified unlawful activity,'" as defined in 18 U.S.C. § 1956(c)(7), "or a conspiracy to commit such offense."

41.     Narcotics trafficking, in violation of 21 U.S.C. §§ 841(a)(1), 846, 952, 959, and 963, is a "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7)(B)(i).

42.     At all times pertinent to this Complaint, and for the reasons set forth above, Plaintiff alleges the Defendant Properties are real property derived from proceeds traceable to a violation of an offense constituting a "specified unlawful activity," or a conspiracy to commit such offense, to wit: narcotics trafficking, and are therefore subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 1956(c)(7).

43.     Attached hereto is the Verification of Special Agent Tina Fletcher of the United States Department of the Treasury, Internal Revenue Service, Criminal Investigation Division, to the effect that she has read this Complaint for Forfeiture, know the contents thereof, and that the matters contained in the Complaint are true and correct to the best of her knowledge, except those matters stated to be alleged upon information and belief, and as to those matters, she believes them to be true.   It is incorporated herein by reference.

<b>REQUEST FOR RELIEF</b>

**WHEREFORE**, the plaintiff prays as follows:

1.     That any persons having an interest in the above-described Defendant Properties be cited to appear herein and answer the Complaint;

2.     That Judgment of Forfeiture be decreed against the Defendant Properties;

4.     That upon Final Decree of Forfeiture, the Internal Revenue Service dispose of the Defendant Properties according to law; and

12

5.    That the plaintiff has such other and further relief as the case may require.

Respectfully submitted,
JAIKUMAR RAMASWAMY, CHIEF
Asset Forfeiture & Money
Laundering Section

Darrin L. McCullough
Trial Attorney
Asset Forfeiture & Money Laundering Section
U.S. Department of Justice
1400 New York Ave., NW
Washington, DC   20005
(202) 616-2255
Darrin.mccullough@usdoj.gov

13

## VERIFICATION

I, Tina Fletcher, hereby verify and declare under penalty of perjury that I am a Special Agent of the Internal Revenue Service, that I have read the foregoing Complaint for Forfeiture and know the contents thereof, and that the matters contained in the Complaint are true to my own knowledge, except those matters therein stated to be alleged on information and belief, and as to those matters. I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my own investigation of this case. I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Tina Fletcher
Special Agent
Internal Revenue Service

Dated: 12/4/13